**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IRENE LAURORA,

       **Plaintiff,**

       v.

BAYER HEALTHCARE LLC, *et al.*,

       **Defendants.**

Civil Action No.: 16-9041 (ES) (JSA)

OPINION

**SALAS, DISTRICT JUDGE**

A former employee of Bayer Healthcare LLC ("Bayer"), Dr. Irene Laurora sues her former employer and former supervisor, Dr. John O'Mullane, for retaliating against her for complaining about his treatment of a colleague who was going on maternity leave. (D.E. No. 45, Second Amended Complaint ("SAC")). Defendants Bayer and Dr. O'Mullane move for summary judgment. (D.E. No. 49). Having considered the parties' submissions, the Court decides this matter without oral argument. Fed. R. Civ. Pro. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court **GRANTS** Defendants' motion and enters judgment in their favor.

## I.     BACKGROUND

Unless noted otherwise, the following facts are not in dispute.[1] Dr. Laurora began working at Bayer in October 2007. (SUMF ¶ 6). She onboarded as the Vice President of Global Medical Affairs Analgesics, Cough, Cold & New Products, and held that position until July 2013. (*Id.* ¶¶ 6 & 7). This position was a salary grade level VS 4.1, the salary grade she would remain at

---

[1] The Court takes these facts from Defendants' Reply to Dr. Laurora's Counterstatement to Defendants' Statement of Undisputed Material Facts. (D.E. No. 50-1 ("SUMF")).

throughout her tenure at Bayer.  (*Id.* ¶¶ 8 & 12).  An employee who obtained a higher VS level was promoted, while an employee who received a lower VS level was demoted.  (*Id.* ¶ 182).  In August 2013, Dr. Laurora became the Head of U.S. Medical Affairs at Bayer and held that position until January 2015.  (*Id.* ¶¶ 10–11).  In January 2015, Dr. Laurora became one of five Global Category Leaders, Analgesics, Cough Cold, Cardio and Footcare, and held that position through September 30, 2016.  (*Id.* ¶¶ 14 & 168).  The parties agree that Dr. O'Mullane was involved in the decision to hire Dr. Laurora for that position, though they disagree about who else was involved. (*Id.* ¶ 16).  The position was in Dr. O'Mullane's Innovation & Development organization.  (*Id.* ¶ 17).  In that role, Dr. Laurora had two direct reports, one of whom was Margaret Gryszkiewicz. (*Id.* ¶ 19).

Expecting a child, Gryszkiewicz scheduled maternity leave from June through September 2015.  (*Id.* ¶ 24).  On May 4, 2015, Dr. Laurora emailed Dr. O'Mullane suggesting several options and seeking Dr. O'Mullane's feedback.  (*Id.*).  After discussing these coverage options, Dr. O'Mullane left the decision to Dr. Laurora's discretion, who chose the "rotational assignment" option to cover Gryszkiewicz's work while she was on leave.  (*Id.* ¶¶ 26–27).

Around this time, Bayer was working with a United Kingdom-based company, TTP, on a project to develop a new device.  (*Id.* ¶¶ 29–30).  Gryszkiewicz had been involved in the TTP project since March 2015, working with other Bayer employees, including Simon Gilburt.  (*Id.* ¶¶ 31 & 33).[2]

In May 2015, Dr. O'Mullane visited TTP in Cambridge, United Kingdom.  (*Id.* ¶ 36).  On May 8, 2015, Dr. O'Mullane held a meeting with Dr. Laurora, Gryskiewicz, and Gilburt to debrief them about his trip and the status of the TPP project.  (*Id.* ¶ 40).  He participated by phone while

---

[2]      The parties dispute the extent of Gilburt's involvement in the project.  (SUMF ¶¶ 33–34).

Dr. Laurora, Gryskiewicz, and Gilburt were together in a room.  (*Id.* ¶ 41).  During the meeting, Dr. O'Mullane indicated he was impressed with TTP, spoke about the project's importance, and inquired about the project "champion."  (*Id.* ¶¶ 42–45).  "Champion" was Dr. O'Mullane's term for someone who was responsible for spearheading the project from within the company, someone who would move the project forward and be an advocate for the project within Bayer.  (*Id.* ¶ 46).[3] In response, Gryszkiewicz indicated she had been acting as the project champion for several months.  (*Id.* ¶ 47).[4]  According to Dr. Laurora, Dr. O'Mullane responded, in effect, that he could not see how Gryskiewicz could take on that role in light her "impending family event."  (*Id.* ¶ 49).

On the evening of May 9, Dr. Laurora sent the following email to Dr. O'Mullane:

> I feel compelled to share my feelings regarding the treatment of Margaret yesterday. In no uncertain terms Margaret was told that she could not be a project "champion" because of her pending [maternity[5]] leave. Meanwhile this is a project that has been going on for almost two years and has at least a 2 to 3 year program ahead, 3 months would not be a problem for someone (either me or Simon) to cover.
>
> After your initial feedback from your meeting with TPP she and I discussed that she would champion the project and she has been working closely with her business partner. However we both felt it was most appropriate to be Bayer's champion not TPP's champion.
>
> The project was transferred to us in March. Margaret has been working hard to move the project forward since then. I feel that the way the meeting took place was very inappropriate and disrespectful

---

[3]     Although Dr. Laurora and Defendants say they dispute the definition of the term "champion," they provide definitions of that term that are entirely consistent with one another.  (*Compare* SUMF ¶ 36 (Dr. Laurora explaining it was Dr. O'Mullane's term "to describe the individual who would spearhead a project within the Company, act as TTP's advocate for the project within Bayer, and interact with other groups within the organization to provide both the employee and the project itself with maximum visibility"), *with* ¶ 227 (Defendants explaining it was "Dr. O'Mullane's term for someone who is responsible for moving the project forward and being an advocate for the project within the Company")).

[4]     Defendants object to relying on Gryszkiewicz's statement on the basis it is hearsay.  (SUMF ¶ 47).  However, Dr. Laurora does not ask the Court to rely on this statement for its truth value.  Nor will the Court do so.

[5]     While the original email says "maturity leave" (SUMF ¶ 57), the parties do not dispute that anything turns on that typographical error.  Nor is there any suggestion in the record that Dr. O'Mullane was confused and did not understand what Dr. Laurora was saying.

of Margaret.

I felt I needed to tell you.

(*Id.* ¶ 57).  Dr. Laurora sent the above email, she testified in her deposition, because she believed

Dr. O'Mullane violated the law by not allowing Gryskiewicz to serve as project champion.  (*Id.* ¶

245).

The next day on May 10, Dr. O'Mullane responded:

> I appreciate your candid feedback – it's something you and I must
> discuss further. I don't believe this is the way to develop trust and
> integrity in our relationship. Confronted with the same situation my
> approach would have been to discuss this with my leader and then
> take a revised recommendation back to the person impacted if a
> change of direction was agreed as the result of that discussion.
> Acting in the way that you did sets a tone that you have the final
> decision in this matter . . . . .
>
> I would have made the same decision for anybody knowing that they
> were about to take a significant planned absence. This was not
> intended to be disrespectful of Margaret but frankly the opposite of
> wanting to be respectful to her at a time when we need to have
> somebody [fulfill] this role who is present at this very critical time.
> I don't see how Margaret can do that but I am prepared to discuss
> further if you have a different POV.

(*Id.* ¶ 58 (ellipses in original)).  In his deposition, Dr. O'Mullane testified that his statement—"I

don't believe this is the way to develop trust and integrity in our relationship"—referred to the

manner in which she complained about his conduct.  (D.E. No. 52-1, Ex. 2, January 25, 2018

Deposition of Dr. O'Mullane ("Dr. O'Mullane Dep."), at 316–17). "If we had a disagreement,"

Dr. O'Mullane testified, "it was better for us to have that disagreement aired and sorted out rather

than airing it for the first time in a meeting with other folks." (*Id.*).  In other words, Dr. O'Mullane

thought it best for Dr. Laurora to approach him first, rather than to approach Gryszkiewicz first,

as he indicated in the remainder of that paragraph.

On May 11, Dr. Laurora and Dr. O'Mullane discussed her concerns in a meeting.  (SUMF

¶ 64).  Dr. O'Mullane told Dr. Laurora that he did not intend to offend Gryszkiewicz and said he would apologize.  (*Id.* ¶ 65).  In her deposition, Dr. Laurora testified that she felt threatened by the meeting.  (*Id.* ¶ 249).  However, she could not specify what Dr. O'Mullane did *at the meeting* to make her feel threatened.  (D.E. No. 52-1, Ex. 1, November 28, 2017 Deposition of Dr. Laurora ("Dr. Laurora Dep."), at 130–32).  All she could say is that Dr. O'Mullane's email was threatening because it "was very hostile," "was impugning my leadership," and "was questioning my authority."  (*Id.* at 132).  That made the "whole milieu" of the meeting "very threatening."  (*Id.*).  A few days after their meeting, Dr. O'Mullane met with Gryszkiewicz to discuss her concerns about the incident.  (SUMF ¶ 66).

Dr. Laurora claims that following her complaint, Dr. O'Mullane retaliated against her for objecting to his treatment of Gryszkiewicz at the May 8 meeting.  Dr. O'Mullane denies that charge.  Below the Court will outline the facts on which the parties rely to shape the relationship between Dr. Laurora and Dr. O'Mullane following their above email exchange.

*Time-Off Request*: On May 27, a few weeks following Dr. Laurora's complaint, Dr. O'Mullane approved Dr. Laurora's request for eight days off in the following two months and for every Friday off for the entire summer.  (*Id.* ¶ 70).  Dr. Laurora says this request was routine and therefore should not counted in favor of Dr. O'Mullane.

*Resource Constraints and Feedback*: According to Dr. Laurora, following the May 10, 2015 email, Dr. O'Mullane denied giving her resources she needed to succeed in the company and declined to give her necessary feedback.  (*Id.* ¶¶ 253–70).  While Defendants dispute this conclusion, they do not dispute some of the facts underlying it.  For example, Defendants do not dispute that, even though Dr. Laurora had authority to sign contracts up to $5 million, Dr. O'Mullane did not allow her to enter into contracts greater than $20,000 on behalf of Bayer without

his approval.  (Dr. Laurora Dep. at 265).  That said, Dr. Laurora does not point to any evidence indicating that Dr. O'Mullane treated other similarly situated employees differently when it came to their authority to sign contracts.  In addition, Defendants appear not to dispute that Dr. O'Mullane restricted Dr. Laurora's ability to hire employees for administrative assistance.  (SUMF ¶ 253; *see also* D.E. No. 52-1, Ex. 25 (April 28, 2015 email from Dr. Laurora to Dr. O'Mullane requesting "Admin support," to which Dr. O'Mullane responded on May 11, 2015, "Let's discuss Monday")).  Even still, Dr. Laurora does not provide any evidence concerning Dr. O'Mullane's rationale, or whether Dr. O'Mullane restricted other similarly situated employees' ability to do so.  Defendants *do* dispute whether Dr. O'Mullane gave Dr. Laurora a midyear review in 2015.  (SUMF ¶ 256–257).  Defendants say he did, while Dr. Laurora says he did not.  (*Id.*).  For purposes of this motion, the Court will assume Dr. O'Mullane gave every person he supervised a midyear review except for Dr. Laurora.

*Development Dialogue Meeting*:  On September 2, 2015, Dr. Laurora and Dr. O'Mullane had a development dialogue meeting, a typical practice at Bayer to provide ongoing feedback to employees about their career development.  (*Id.* ¶¶ 75–76).  As a result of the meeting, Dr. Laurora and Dr. O'Mullane created a development dialogue document in which Dr. Laurora input the following comment: "I feel we have an appropriate plan to improve my skills and effectiveness.  We came to an agreement to focus now on driving new ideas to the pipeline for Aleve and Aspirin." (*Id.* ¶ 78).

*Rx-OTC Switch Science Position*:  On September 8, 2015, Dr. Laurora expressed an interest in the Rx-OTC Switch Science position, which "would have had job duties relating to redesigning Bayer products that were only available by prescription (Rx) to an over-the-counter (OTC) product."  (*Id.* ¶ 80).  She applied for the position, and Dr. O'Mullane interviewed her for it in

early February 2016.  (*Id.* ¶¶ 81–82).  On March 23, 2016, Dr. O'Mullane emailed Dr. Laurora that Bayer was not going to fill the Rx-OTC Switch Science position, to which Dr. Laurora responded, "Thank you, I understand the challenges."  (*Id.* ¶¶ 84–85).  The parties dispute whether Bayer ever "filled" the position.  Defendants say Bayer did not, and that it merged the responsibilities of that position with the position then held by Kristie Licata.  (*Id.* ¶¶ 86–87 & 281).  Dr. Laurora does not significantly dispute that contention, but she adds that Licata fulfilled the responsibilities of the Rx-OTC position for three months on an interim basis prior to the merger.  (*Id.* ¶ 86).  Thus, it appears the dispute concerning whether the position was "filled" is largely semantic.  The parties also dispute Licata's qualifications, though not significantly.  Dr. Laurora highlights that Licata came from a commercial background, while Defendants add she also had some science background.  (*Id.* ¶ 282).  Be that as it may, it appears Licata did not have a science-based graduate degree, and that the decision to merge the two positions was based, in part, on Licata competently fulfilling the responsibilities of the Rx-OTC Switch Science Position during, what Dr. O'Mullane described as, a "trial period . . . of three months."  (Dr. O'Mullane Dep. at 353–54).

*2015 Performance Review*: On February 16, 2016, Dr. Laurora and Dr. O'Mullane met to discuss her 2015 performance review.  (SUMF ¶ 89).  The parties dispute when Dr. O'Mullane wrote the performance review.  Dr. Laurora says at the latest in early December 2015, relying on an email that Sandy James, the Human Resources Business Partner, sent to Dr. O'Mullane on December 9, 2015.  (D.E. No. 52-1, Ex. 27).  December 2015 is seven months after Dr. Laurora's email exchange with Dr. O'Mullane.

Dr. Laurora received an overall rating of "Fully Meets Expectations," which she deemed acceptable.  (SUMF ¶ 90).  The rating was a combination of her job performance rating and her

Leadership, Integrity, Flexibility and Efficiency ("LIFE") ratings, designed to measure employee's adherence to Bayer's core values. (*Id.* ¶¶ 91–92). Dr. Laurora received "Exceeds Expectations" ratings in the Integrity and Flexibility categories (*id.* ¶ 97); "Fully Meets Expectations" in the Efficiency category (*id.* ¶ 98); and "Partially Meets Expectations" in the Leadership Category (*id.* ¶ 99). In the 2015 performance review, Dr. O'Mullane stated,

> [Dr. Laurora's] style is one of leading from the front, which in many situations is great and in other situations such as the Category role does not always work to her advantage. Her style of Leadership needs to be moderated for her to truly [be] successful in this role. I would suggest some reflection on how to create an environment of abundance and looking for strong win-win situations where she can demonstrate her ability to truly lead an organization.

(*Id.* ¶ 100). Dr. Laurora stated in the employee comment section of her review: "Since this Category Leadership role is new (to the organization and to me personally) I have appreciated feedback from others and spent time reflecting on the way I work. I will actively incorporate changes to my leadership style as a result." (*Id.* ¶ 101). Though Dr. Laurora maintains this negative rating snowballed into the end of her career at Bayer, she admits the score "did not affect [her] compensation increase for 2016." (*Id.* ¶ 104). For that year, Dr. Laurora received a 1% raise. (*Id.* ¶ 273). While she maintains she was entitled to a 2.5% raise, she does not provide any evidence that any similarly situated employee received such a raise. (*Id.*). That said, it is undisputed that she received a 2% raise in previous years when she received the same overall rating of "Fully Meets Expectations." (*Id.* ¶ 274).[6]

Following this performance review, Dr. Laurora sought out feedback for her leadership qualities. (*Id.* ¶ 261). According to Dr. Laurora, Dr. O'Mullane had nothing to say about her

---

[6]     The parties dispute whether Dr. O'Mullane originally intended to give "Partially Meets Expectations" in the flexibility category but changed it to "Fully Meets Expectations" after learning she would have been penalized monetarily as a result. (SUMF ¶¶ 105–07). Because nothing appears to turn on the existence or nonexistence of this fact, the Court will not consider it beyond this footnote.

leadership, indicating that the problems were not with her performance but with larger, structural issues within Bayer.  (*Id.* ¶¶ 261–62).  In addition, Dr. Laurora identified programs she could participate in to improve her leadership (D.E. No. 52-1, Ex. 11), but Dr. O'Mullane did not think it was a good idea because the best training, in his view, and as he told her, was on the job (Dr. O'Mullane Dep. at 269–72).

*Rapid Results Initiative*: Dr. O'Mullane selected Dr. Laurora to work with a third-party company called Schaffer on the "Rapid Results initiative."  (SUMF ¶ 108).  The initiative began between December 2015 and February 2016.  (*Id.* ¶ 109).  The purpose of the initiative is in dispute.  (*Id.* ¶ 110).  Defendants say it was to develop Dr. Laurora's entrepreneurial skills.  (*Id.*).  Dr. O'Mullane, Defendants say, believed that the Rapid Results initiative was a good opportunity for her to develop her leadership skills and increase her visibility within Bayer.  (*Id.* ¶ 121).  Meanwhile, Dr. Laurora says it was to "explore[] ways to accelerate and demonstrate 'proof of concept' for the new IRD Category leadership operating model."  (*Id.* ¶¶ 110 & 215).  And as she points out, another category leader, like her, was placed in the Rapid Results initiative with Schaffer.  (*Id.* ¶ 110).  Under either theory, however, Dr. Laurora's participation was geared towards improving her professional skills.  (*Id.*).  As part of the initiative, Schaffer provided a mentor and coach to Dr. Laurora and her team.  (*Id.* ¶ 111).  Dr. Laurora received an assignment called "Aleve Beyond the Pill," she was responsible for coming up with ideas on how to use Aleve beyond its use as a pill, and Dr. O'Mullane placed her in charge of her team.  (*Id.* ¶¶ 112–14).  Dr. O'Mullane asked Dr. Laurora to give a presentation on the Rapid Results initiative at a Global Town Hall that was open to everyone in the company.  (*Id.* ¶¶ 116–17).[7]

*Bayer's Restructuring*: At some point, Bayer decided to restructure and reorganize.  (*Id.* ¶

---

[7]     The parties agree the Rapid Results initiative was generally a success, but dispute whether Dr. O'Mullane believed it to be a success and applauded Dr. Laurora for it.  (*Id.* ¶¶ 118–120).  Because Dr. Laurora does not make

123).   Pursuant to the restructuring, Bayer eliminated all Category Leader roles, including Dr.

Laurora's position.   (*Id.* ¶¶ 125 & 132).   Decisions to eliminate positions in the restructuring were

made in April 2016 by a committee known as the I&D 20/20 Steering Committee.   (*Id.* ¶ 128).

The members of the Steering Committee were Dr. O'Mullane; Erica Mann, who was the CEO of

the Consumer Health Division and Dr. O'Mullane's manager; and Sean Kolb-Hunt, who was

Senior Vice President of Human Resources for the Consumer Health Division.   (*Id.* ¶ 129).   Kolb-

Hunt was not aware of Dr. Laurora's May 2015 complaint at the time of the restructuring, and

there is no evidence to suggest Mann was aware of it either.   (*Id.* ¶¶ 130–131).[8]

*Head of Therapeutics*: On May 27, 2016, Dr. Laurora expressed interest in the Head of

Therapeutics role in the new organization.   (*Id.* ¶ 134).   That position was a salary grade level VS

4.2, a full salary grade above any position Dr. Laurora held at Bayer.   (*Id.* ¶¶ 134–135).   The

Steering Committee did not hire Dr. Laurora for that position.   (*Id.* ¶ 146).

The parties dispute why.   Defendants maintain it was because Dr. Laurora did not have the

requisite skills, background, experience, or leadership qualities for the job.   (*Id.* ¶¶ 136–140).   Dr.

Laurora says it was because of Dr. O'Mullane's 2015 performance review.   (*Id.*).   In support, she

points to a document attached to an email Sandy James, the Human Resources Business Partner,

sent to Dr. O'Mullane just past midnight on June 14, 2016.   (*Id.* ¶ 136).   The email attached a

document titled, "**I&D 2020 Talking Points**" and the subtitle of the document was "**John**

**O'Mullane to Irene Laurora – Discussion to be held on 6/14/2016**."   (D.E. No. 52-1, Ex. 13).

In the attached document, James suggested the following:

> **[Dr. O'Mullane] you will need to discuss here why you feel that**
> **[Dr. Laurora] is not a candidate for the Head, I&D Therapeutics**

---

anything of Dr. O'Mullane's alleged disapproval of her performance during the Rapid Results initiative in her
opposition brief, the Court will not consider this dispute beyond here.

[8]      While the parties dispute whether there is evidence suggesting Mann was *not* aware of the complaint, neither
party provides evidence she *was* aware of it.   (SUMF ¶ 131).

> **position since she expressed to you that she was qualified in her e-mail to you.  This should revolve around her Leadership Capabilities as mentioned in her 2015 PMP at which time you rated her a Partially Meets Expectations.**

(*Id.* (emphasis in original)).   A few hours later, Dr. O'Mullane responded to James via email, attaching what appears to be the same document, with the same title and subtitle, with many of the same talking points, though edited.  (D.E. No. 52-1, Ex. 35).  The only portion of the document that discusses the Head of Therapeutics position says the following:

> [Dr. Laurora], I know that you asked whether you would be a candidate for the Head, I&D Therapeutics role.  This role requires an extremely high level of Leadership acumen – the group will have about 110 people and we are looking for somebody who has already demonstrated an ability and a skill in this leadership competency to head our most important Unit.

(*Id.*).

It is unclear whether Dr. O'Mullane specifically referenced the leadership rating in Dr. Laurora's 2015 performance review in the June 14, 2016 meeting.  According to Dr. Laurora, Dr. O'Mullane said she would not be considered for the position "because she lacked the necessary leadership experience."  (SUMF ¶ 302).  In support, Dr. Laurora cites the attachment referenced above.  (*Id.*).  Disputing that, Dr. O'Mullane says the document was merely a list of talking points. (*Id.*).

In this litigation, Defendants raise more specific reasons why Dr. Laurora was not considered for the position.  They say she did not have the "requisite skills and experience for the role" (*id.* ¶ 136); that she did not have "the requisite experience in bringing new products all the way to market" (*id.* ¶ 137); that she "did not have the requisite leadership qualities" (*id.* ¶ 138); and that she "did not have the requisite degree for the role, a Ph.D or M.D." (*id.* ¶ 139).  (Dr.

Laurora "has a doctor of pharmacy degree." (*Id.* ¶ 171).)

Bayer ultimately hired an outside candidate, Dr. Josephine Fubara, who has a Ph.D, had worked in multiple areas of research and development in prior roles, had experience in leadership development and background in the medical and clinical spaces, and was responsible for launching Nexium, one of the most successful over-the-counter launches in the pharmaceutical industry. (*Id.* ¶¶ 141–144).[9]

*Head of R&D Operations*: Dr. Laurora also believes she was qualified for the new position of Head of R&D Operations. (*Id.* ¶ 152). That position was a salary grade VS 4.1. (*Id.*). However, Bayer hired Dr. Karen Hackney instead, because she previously held a similar position in the UK; her organizational skills, attention to detail, capacity for undertaking complex work, and experience ruling the operation aspect of clinical trials; and she lived in Basel, Switzerland—where the position was located—thus saving Bayer on relocation costs. (*Id.* ¶¶ 153–156). Dr. Laurora does not seriously dispute any of that. Instead, she merely says the only reason she (Dr. Laurora) was not chosen was because the position was located in Basel, Switzerland. (*Id.* ¶ 154). She does not cite any evidence in the record that the other reasons listed above did not motivate the Steering Committee to hire Hackney.

*Termination*: On August 2, 2016, Dr. Laurora was offered a Technical Category Lead role, which was a salary grade VS 3.0. (*Id.* ¶ 166). The position was a salary grade lower than what she was then working at. (*Id.* ¶ 167). While her *base salary* would have remained the same for the first year, her total compensation would have decreased. (*Id.*). She declined the position, and

---

[9]     Dr. Laurora objects to the Court considering Dr. Fubara's background on hearsay grounds. (SUMF ¶¶ 142–144). They have been submitted in the record through the deposition testimony of Kolb-Hunt and through Dr. O'Mullane's sworn declaration. (*Id.*). It is unclear why the fact Kolb-Hunt and Dr. O'Mullane elicit facts about another person means that they are uttering hearsay. Dr. Laurora does not explain why that is, and so the Court will consider Dr. Fubara's background.

as a result, her employment with Bayer ended on September 30, 2016.  (*Id.* ¶ 168).

Against this backdrop, Dr. Laurora filed suit against Bayer and Dr. O'Mullane on December 7, 2016.  (D.E. No. 1). Relevant here, her SAC asserts retaliation claims under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*; Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5–1, *et seq.*[10]

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  A genuine dispute of material fact exists if the evidence is such that a reasonable jury could find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When a court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The burden of establishing the non-existence of a "genuine issue" is on the party moving for summary judgment.  *Aman v. Cort Furniture Rental Cop.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party must satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving

---

[10]     On January 30, 2017, Dr. Laurora filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation against Defendants under Title VII and subsequently received a notice of right to sue from the EEOC on January 31, 2018.  (SAC ¶¶ 17–18).  Pursuant to the right to sue, Dr. Laurora filed the SAC, in which she also alleged Title VII violations for gender discrimination and retaliation. (*Id.* ¶ 19). She no longer pursues her claim of gender discrimination.  (SUMF ¶ 170).

party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir 2002) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  Credibility determinations are the province of the fact finder.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

Dr. Laurora claims Defendants violated the FMLA, Title VII, and the NJLAD by retaliating against her for complaining to Dr. O'Mullane about his treatment of Gryszkiewicz at the May 8, 2015 meeting.[11]  There is no dispute (i) that the FMLA entitles an employee to take 12 workweeks of leave for the pending birth of a child, 29 U.S.C. § 2612(a)(1), and that an employer cannot interfere with the employee's right to do so, *id.* § 2615(a)(1); (ii) that Title VII forbids discrimination on the basis of sex, 42 U.S.C. § 2000e-2(a), and that this "prohibition is breached

---

[11]      Dr. Laurora also asserts an NJLAD claim for individual liability against Dr. O'Mullane for aiding and abetting unlawful retaliation.  However, Dr. Laurora does not contest that her aiding-and-abetting claim against Dr. O'Mullane rises and falls with her retaliation claims against Bayer.  *See Coward v. City of Englewood*, No. A-5651-16T1, 2019 WL 470080, at *5 (N.J. Super. Ct. App. Div. Feb. 7, 2019) ("There is no individual liability for aiding or abetting absent a finding that the employer violated the LAD.").  Because the Court ultimately finds there is no dispute of material fact that Bayer (or Dr. O'Mullane) did not engage in unlawful retaliation, the Court will not separately address the NJLAD claim for individual liability against Dr. O'Mullane beyond here.

'whenever an employee's pregnancy [or related medical condition] is a motivating factor for the employer's adverse employment decision,'" *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008) (quoting *In re: Carnegie Ctr. Assoc.*, 129 F.3d 290, 294 (3d Cir. 1997)); and (iii) that the NJLAD forbids discrimination on the basis of pregnancy, N.J.S.A. § 10:5-12.  In addition, there is no dispute that all three statutes prohibit an employer from retaliating against an employee for opposing a practice made unlawful under the statutes, such as those described above.  *See* 29 U.S.C. § 2615(a)(2); 42 U.S.C. § 2000e-3(a); N.J.S.A. § 10:5-12(d).  Finally, there is no dispute that each of Dr. Laurora's retaliation claims are assessed under the same evidentiary framework. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) ("Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law."); *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841–42 (3d Cir. 2016) (explaining that all Title VII and NJLAD retaliation claims are assessed under the same framework, and collecting cases).[12]  Under that same framework, a claimant can show retaliation in one of two ways.  The first is through direct evidence under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and the second is through circumstantial evidence under the now-familiar three-part burden-shifting framework the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Dr. Laurora pursues both theories.

### A.   Direct Evidence of Retaliation

Once a plaintiff provides "direct evidence" that retaliation was a motivating factor in the defendant's decision, the burden of proof shifts to the defendant to show the disputed action would have been taken regardless of the retaliatory motive.  *See Price Waterhouse*, 490 U.S. at 276

---

[12]     Neither party calls on the Court to determine whether the FMLA permits mixed-motive claims.  *See Lichtenstein*, 691 F.3d at 302 (raising the issue but not deciding it); *cf. Egan v. Delaware River Port Auth.*, 851 F.3d 263, 274 (3d Cir. 2017) (upholding Department of Labor's interpretation that the FMLA employs a mixed-motive analysis under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)).

(O'Connor, J., concurring).  The direct evidence must be "so revealing of [discriminatory] animus that it is unnecessary to rely on the [*McDonnell Douglas*] burden-shifting framework, under which the burden of proof remains with the plaintiff."  *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (quoting *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512 (3d Cir. 1997)).  "To qualify as direct evidence, the evidence must be such that it demonstrates that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision."  *Id.* (cleaned up).  Direct evidence must satisfy two requirements: first, the evidence must be strong enough to permit a reasonable jury to infer that retaliatory animus was more likely than not a motivating factor in the decision; and second, the evidence must be connected to the decision challenged by the plaintiff—such as through statements of the Defendants' employees around the time of the challenged action or by a person closely linked to the decision.  *Id.*  This burden, the Third Circuit has said, presents a "high hurdle."  *Id.* (quoting *Walden*, 126 F.3d at 513).  For example, in *Anderson*, the Third Circuit endorsed the view that "the phrase 'you people' is too ambiguous to constitute direct evidence of discrimination when used in isolation."  *Id.* at 269.  Meanwhile, in *Rose v. New York City Board of Education*, 257 F.3d 156 (2d Cir. 2001), the Second Circuit held that a supervisor's repeated remarks to an employee that he would replace her with someone "younger and cheaper" was sufficient for a reasonable jury to find direct evidence of discriminatory animus in an age discrimination lawsuit.  *Id.* at 162.

In their moving brief, Defendants argue that Dr. Laurora "has no direct evidence of retaliation" and thus must proceed under *McDonnell Douglas*.  (D.E. No. 49-1 ("Mov. Br.") at 16).  Dr. Laurora disagrees, primarily relying on one sentence in Dr. O'Mullane's response to her complaint: "I don't believe this is the way to develop trust and integrity in our relationship."  (D.E.

No. 52 ("Opp. Br.") at 7 (quoting SUMF ¶ 58)).

The Court agrees with Defendants.  Though she quotes the entire passage, Dr. Laurora analyzes Dr. O'Mullane's statement in isolation.  Even then, the statement is, at best, ambiguous. Dr. O'Mullane objected to "this."  He used "this" as pronoun, but he neglected to add the noun that "this" was supposed to introduce.  It is unclear what "this" is referring to.  Dr. O'Mullane's statement here is far more ambiguous than the "you people" comment in *Anderson*, and it is a far cry from the type of direct evidence in *Rose*.

The surrounding context of the statement does even less to support Dr. Laurora and, in fact, supports Defendants.  In whole, here is what Dr. O'Mullane wrote:

> I appreciate your candid feedback – it's something you and I must discuss further. I don't believe this is the way to develop trust and integrity in our relationship. Confronted with the same situation my approach would have been to discuss this with my leader and then take a revised recommendation back to the person impacted if a change of direction was agreed as the result of that discussion. Acting in the way that you did sets a tone that you have the final decision in this matter . . . . .

> I would have made the same decision for anybody knowing that they were about to take a significant planned absence. This was not intended to be disrespectful of Margaret but frankly the opposite of wanting to be respectful to her at a time when we need to have somebody [fulfill] this role who is present at this very critical time. I don't see how Margaret can do that but I am prepared to discuss further if you have a different POV.

(SUMF ¶ 58). Reading the statement in its entirety, it would be unreasonable for a juror to find that Dr. O'Mullane was referring to anything other than the manner in which Dr. Laurora went about objecting to his conduct.  Dr. O'Mullane first thanked Dr. Laurora for her feedback and offered to discuss the matter further.  Immediately following his "trust and integrity" statement, he conveyed *how* he would have handled an analogous situation—by approaching his supervisor first as opposed to approaching a shared subordinate.  Doing the opposite, he said, made it seem

like Dr. Laurora had the final say in the matter.  Following this email, Dr. O'Mullane addressed Dr. Laurora's concerns.  They met the next day to discuss those concerns (*id.* ¶ 64), and Dr. O'Mullane promptly met Gryzkiewicz to discuss the issue (*id.* ¶ 66).  Finally, in his deposition, he testified that his "trust and integrity" statement was in reference to the manner in which Dr. Laurora raised her concerns in front of their subordinate, and not in reference to her complaint itself.  (Dr. O'Mullane Dep. at 316–17).

Dr. Laurora points to events that occurred after he made the statement to suggest his objection was to the fact she complained.  (Opp. Br. at 8–9).  For example, she points to facts that occurred after she sent him that email, such as Dr. O'Mullane denying her resources she requested for her job, declining to provide her feedback on her job performance, and rating her with a "Partially Meets Expectations" on the leadership metric of her performance reviews.  (*Id.*). Leaving aside the fact Dr. Laurora appears to argue a reasonable juror can *infer* retaliatory motive, and that the Court here is dealing with whether there is *direct* evidence of such a motive, the record does not reasonably support the conclusion that Dr. O'Mullane's subsequent actions evince retaliatory animus.  This conclusion will be discussed more fully in the context of whether Dr. Laurora established a causal connection between her protected activity and the adverse treatment she experienced.  (*See infra* Part III.B.iii).

### B.  <u>Circumstantial Evidence</u>

The Court now will analyze Dr. Laurora's claims under the *McDonnell Douglas* burden-shifting framework.  Under that framework, the plaintiff bears the initial burden of establishing a prima facie case by showing: (i) she engaged in protected activity; (ii) she suffered an adverse employment action; and (iii) the adverse employment action was causally related to her protected activity.  *See Lichtenstein*, 691 F.3d at 302 (FMLA); *Moore v. City of Philadelphia*, 461 F.3d 331,

341 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (Title VII); *Henry v. New Jersey Dep't of Human Servs.*, 9 A.3d 882, 889 (N.J. 2010) (NJLAD).  Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to provide evidence of a legitimate, nonretaliatory reason for the adverse employment action.  *See Lichtenstein*, 691 F.3d at 302; *Moore*, 461 F.3d at 341; *Henry*, 9 A.3d at 889.  If the defendant does so, the burden shifts back to the plaintiff to prove that the profered legitimate, nondiscriminatory reason is pretext for retaliation.  *See Lichtenstein*, 691 F.3d at 302; *Moore*, 461 F.3d at 341; *Henry*, 9 A.3d at 889.  The parties dispute each element and step of this evidentiary framework.

### i.      Protected Activity

Defendants offer two reasons why Dr. Laurora's May 9, 2015 email is not a protected employment activity as a matter of law.  The Court agrees with neither.

First, they argue that her email was too vague and thus did not sufficiently raise her concern that Dr. O'Mullane treated Gryszkiewicz unlawfully.  (Mov. Br. at 16–17).  The Court does not agree.  "[O]pposition to an illegal employment practice must identify the employer and the practice—if not specifically, at least by context."  *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006).  Viewing the evidence in light most favorable to Dr. Laurora, a jury can reasonably find she did just that.  She identified Dr. O'Mullane, and expressed her "feelings regarding" how Dr. O'Mullane "told [Gryszkiewicz] she could not be a project 'champion' because of her pending [maternity] leave," even though the "project . . . ha[d] been going on for almost two years and ha[d] at least a 2 to 3 year program ahead."  (SUMF ¶ 57).  Three months, Dr. Laurora went on, "would not be a problem for someone . . . to cover."  (*Id.*).  The way Dr. O'Mullane handled the matter, Dr. Laurora told him, "was very inappropriate and disrespectful of Margaret."  (*Id.*).  Dr. Laurora clearly referenced Gryszkiewicz's pregnancy, a

protected category under Title VII and NJLAD, and her imminent maternity leave, a protected right under the FMLA.  Her email also expressed that Dr. O'Mullane was denying Gryszkiewicz long term employment opportunities because of her pregnancy and for her decision to take maternity leave.  Defendants concede that, if Dr. O'Mullane denied Gryszkiewicz long term employment opportunities because of her pregnancy or because she took maternity leave, then he would have acted unlawfully, in violation of the FMLA, Title VII, and NJLAD.

Second, Defendants argue that Dr. Laurora did not have an objectively reasonable belief that she was opposing unlawful conduct.  (Defs. Mov. Br. at 17–20).  But while it is true that a plaintiff must have an objectively reasonable belief she was opposing unlawful conduct, *Daniels v. Sch. Dist. of Philadelphia,* 776 F.3d 181, 194–95 (3d Cir. 2015), this case is at the summary judgment stage, and a reasonable juror could find for Dr. Laurora on this issue.  It is not enough for Dr. O'Mullane to argue that he did not treat Gryszkiewicz unlawfully because he sought only to cover her post while she was on maternity leave.  For one, an employee "need not prove the merits of the underlying discrimination complaint" but only that "a reasonable person in [the plaintiff's] circumstances could conclude" that the underlying employment practice was unlawful. *Moore*, 461 F.3d at 344.  And for another, Dr. Laurora disputes that, maintaining that Dr. O'Mullane denied Gryszkiewicz longer term employment opportunities.  And based on her email, it appears that is precisely how she understood the May 8 meeting.

### ii.      Adverse Employment Action

The parties dispute whether Dr. Laurora suffered adverse employment action when (i) Dr. O'Mullane scored her as "Partially Meets Expectations" in the leadership category of her 2015 performance review, and (ii) she was not selected for the Rx-OTC Switch Science position. Defendants concede that eliminating Dr. Laurora's job in the restructuring, and Defendants'

decision not to extend her the Head of Therapeutics and the Head of R&D Operations positions, constitute adverse employment actions.

As to the leadership score, Defendants argue such cannot constitute adverse employment action because the score did not diminish Dr. Laurora's salary.  (Mov. Br. at 20–21).   But Defendants conceded that the standard for adverse employment action in the retaliation context is whether the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (cleaned up); *see also Kasper v. Cty. of Bucks*, 514 F. App'x 210, 216 (3d Cir. 2013) (assuming "*arguendo*" that *Burlington Northern* applies to the FMLA);[13] *Roa v. Roa*, 985 A.2d 1225, 1236 (N.J. 2010) (adopting *Burlington Northern* for the NJLAD).  Defendants offer little about that standard.   That is likely enough to deny summary judgment on this issue. Moreover, Defendants acknowledge that under the more stringent standard, a lower performance score can constitute adverse action if it resulted in "ineligibility for promotional opportunities." (Mov. Br. at 20 (quoting *Sykes v. Pennsylvania State Police*, 311 F. App'x 526, 529 n.2 (3d Cir. 2008) (quoting *Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006)))).  In considering the email exchange of talking points between James and Dr. O'Mullane—which explicitly referenced Dr. Laurora's leadership score as a reason not to extend her superior employment—a reasonable jury could find Dr. Laurora lost out on a promotional opportunity because of her negative leadership

---

[13]     District courts within the Third Circuit have predicted that the Third Circuit would adopt that standard if a case presented the opportunity to do so.  *See Turner v. New Jersey State Police*, No. 08-5163, 2017 WL 1190917, at *24 n.47 (D.N.J. Mar. 29, 2017) (collecting cases).   Because Defendants argue that Dr. Laurora cannot meet *Burlington Northern*'s less restrictive standard and make no argument concerning the more restrictive one apparently still operative under the FMLA, the Court will thus apply a plaintiff-friendly presumption and apply *Burlington Northern* here.

score.[14]

As to the Rx-OTC Switch Science position, Defendants argue their refusal to hire Dr. O'Mullane does not constitute adverse employment action because they never filled the position. (Mov. Br. at 21–22). Defendants cite various cases in support of that claim. However, only two cases they cite post-date *Burlington Northern*, and neither case recited the proper standard, engaged in significant discussion of the issues, or rested their holdings on the failure to fill the position. *See Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 414 (7th Cir. 2018) (no adverse action where the plaintiff "never applied for or showed any interest in" the position); *Murray v. Beverage Distribution Ctr., Inc.*, 757 F. Supp. 2d 480, 488–89 (D.N.J. 2010) (similar). Without more appropriate argument, the Court cannot grant summary judgment to Defendants on this issue. *Burlington Northern*'s standard is fact intensive in that the "significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." 548 U.S. at 69. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)). A jury would have to assess how the context applies to Defendants' decision not to hire Dr. Laurora for the Rx-OTC Switch Science

---

[14] Defendants make much of the fact that Dr. Laurora admitted she received an acceptable *overall* rating at the time. As noted, Dr. Laurora's overall rating was "Fully Meets Expectations." The Court cannot attach so much significance to this fact to take the issue from a jury. A world where Dr. Laurora objected to her overall score is difficult to imagine. Indeed, what was she to do—say she did not fully meet expectations?

Defendants also make much of the following comment Dr. Laurora made on her performance review: "since this Category Leadership role is new (to the organization and to me personally) I have appreciated feedback from others and spent time reflecting on the way I work. I will actively incorporate changes to my leadership style as a result." (PSMF ¶ 101). But that statement is does not acknowledge she deserved her leadership score. Rather, it is merely a promise to improve—a promise good leaders make.

Finally, Defendants argue that the decision not to hire Dr. Laurora was due to her leadership competencies underlying her leadership score, and not the leadership score itself. That argument, the Court thinks, is better assessed in the context of causal connection—i.e., whether there is a causal connection between Dr. Laurora's protected activity and her employment score.

position.

### iii.      Causal Connection

Defendants argue that Dr. Laurora did not present sufficient evidence on which a reasonable jury could conclude that the adverse employment actions she suffered—namely, her negative leadership score, the elimination of her job, and Defendants' decision not to hire her for several positions—are causally related to her protected activity.  (Mov. Br. at 24).  The Court agrees.

"To demonstrate a prima facie case of causation," a plaintiff "must point to evidence sufficient to create an inference that a causative link exists between" the protected activity and adverse action.  *Lichtenstein*, 691 F.3d at 307.  "When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'"  *Id.* (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).  But where, as here, "the temporal proximity is not unusually suggestive," the Court must "ask whether the proffered evidence, looked at as a whole, may suffice to raise the inference."  *Id.* (cleaned up).  Indeed, while "timing and ongoing antagonism [are] often . . . the basis for the causal link," a plaintiff may establish the causal link by other means, such as "by showing that the employer gave inconsistent reasons for terminating the employee."  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000).

Dr. Laurora points to several things she believes establishes persistent retaliatory abuse and thus a causal connection between her protected activity and the adverse actions she suffered.  The issue for Dr. Laurora, however, is that the record does not reasonably support her inferences.

First, Dr. Laurora argues that Dr. O'Mullane explicitly expressed antagonism to her

23

complaint in his May 10, 2015 email, in which he responded to Dr. Laurora's complaint that "I don't believe this is the way to develop trust and integrity in our relationship." (Opp. Br. at 19 (quoting SUMF ¶ 58)). However, as noted above, that statement, even if read in isolation, does not reasonably support the inference that Dr. O'Mullane was hostile towards the fact of her complaint. Nor does the statement support such an inference when the email is read in its entirety. Immediately before the "trust and integrity" statement, he expressed gratitude for Dr. Laurora raising her concerns; immediately following that statement, he suggested how he would have confronted the situation; and at the end of the email, he offered to hear her point of view on the issue. (*Id.*). He testified in his deposition that he was referring to the *manner* in which Dr. Laurora objected to his conduct (Dr. O'Mullane Dep. at 316–17), and Dr. Laurora has pointed to no evidence to rebut his testimony.

Events following the email exchange only support Dr. O'Mullane's deposition testimony. Following his email, he met with Dr. Laurora to discuss her concerns, and then he met with Gryszkiewicz within the week. (*Id.* ¶¶ 64–66). There is no evidence that Dr. O'Mullane raised the issue again, that he was hostile towards Dr. Laurora in their meeting, or that he was hostile to Gryszkiewicz. Following the incident, he approved a time-off request for Dr. Laurora (*id.* ¶ 70), and he selected her to participate in the Rapid Results initiative (*id.* ¶ 108). While Dr. Laurora maintains that Dr. O'Mullane did not give her as much feedback or as many resources as he did to other employees (Opp. Br. at 1, 5, 8 & 19–20), she does not provide sufficient evidence suggesting retaliatory animus. She does not provide any evidence of a *similarly situated* employee receiving more feedback or resources than what she received. Nor does she provide any evidence of how Dr. O'Mullane treated her prior to her complaint.

Second, Dr. Laurora argues that Dr. O'Mullane was indifferent to her complaint because

he failed, she says, to follow up on it by reporting it to Human Resources.  (Opp. Br. at 19).  It is true that a supervisor's failure to follow up and report a complaint may be evidence of indifference and possibly animus.  But Dr. O'Mullane met with Dr. Laurora two days after her complaint, after which he met Gryzkiewicz within the week.  (SUMF ¶¶ 64–66).  There is no evidence in the record suggesting Dr. O'Mullane tried to evade any alleged responsibility he had to report Dr. Laurora's complaint to Human Resources.

Third, Dr. Laurora says that Dr. O'Mullane was hostile towards her within weeks of her complaint by refusing to give her feedback and denying her resources she needed to be successful in her job.  (Opp. Br. at 19–20).  However, the record is far too sparse to reasonably support that conclusion.  While the record supports her claim that Dr. O'Mullane restricted her ability to hire administrative help and required her to obtain his approval to enter into contracts she otherwise did not need his approval to enter into, Dr. Laurora has provided *no* evidence indicating how Dr. O'Mullane treated her before she complained or how he treated similarly situated employees.

Fourth, Dr. Laurora points to the fact that, by December 2015, Dr. O'Mullane scored her as "Partially Meets Expectations" in the leadership category of her performance review.  (Opp. Br. at 20).  However, Dr. Laurora received this score about seven months after her complaint, in between which there is no evidence of hostility towards her for her complaint.  *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'"); *LeBoon*, 503 F.3d at 233 ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation

and defeat summary judgment."); *Jones v. Southeastern Pa. Transp. Authority*, 796 F.3d 323, 331 (3d Cir. 2015) ("We reject Jones's suggestion that a gap of nearly three months (between Jones's harassment complaint and SEPTA's determination that she committed timesheet fraud) raises a red flag, especially when SEPTA spent those three months on a thorough investigation into her alleged malfeasance."). Soon after she received this score, it must be noted, Dr. O'Mullane selected her to participate in the Rapid Results initiative, which was geared at helping her improve her professional skills. He placed her in charge of her team in connection with the initiative, and he asked her to give a presentation at a Global Town Hall. Extending that type of opportunity is a far stray from ongoing retaliatory and antagonistic abuse.

Fifth, Dr. Laurora argues that Defendants relied on the 2015 review to eliminate her position in the restructuring and decline to offer her a position at a comparable level. However, there is *no* evidence Defendants eliminated her position because of her leadership category. And while there is some evidence that Defendants relied on her leadership score to decline extending her certain positions, she does not, and cannot, deny that leadership qualities are appropriate to consider in extending job opportunities. And importantly, other evidence in the record does not establish a causal connection between her complaint and her negative performance review, i.e., that her performance review was a sham.

Sixth, Dr. Laurora argues that Defendants gave shifting rationales about why Dr. Laurora was not selected for certain positions in the restructuring. (Opp. Br. at 22–23). She was initially told, she says, that it was due to her leadership deficiencies. (*Id.*). But then, during this litigation, Dr. Laurora points out, Defendants proffered additional reasons, namely, her degree and experience. (*Id.*). However, Defendants discomfort with her degree and experience are not inconsistent with their discomfort with her leadership qualities. *See Schummer v. Black Bear*

26

*Distribution, LLC,* 965 F. Supp. 2d 493, 499 (D.N.J. 2013) ("But even viewed in a light most favorable to Schummer, the record is replete with evidence that Black Bear's reasons for terminating Schummer were consistent."); *Wooler v. Citizens Bank*, No. 06-1439, 2006 WL 3484375, at *7 (E.D. Pa. Nov. 30, 2006) ("Moreover, Citizens' explanations for its actions are not inconsistent, nor is there any other evidence in the record to support a causal connection between the protected conduct and the adverse employment action."), *aff'd*, 274 F. App'x 177 (3d Cir. 2008). If anything, those reasons are additional reasons not to hire Dr. Laurora. *See Bazargani v. Haverford State Hosp.*, 90 F. Supp. 2d 643, 651 n.15 (E.D. Pa. 2000) ("These multiple grounds are not inconsistent grounds."), *aff'd*, 33 F. App'x 647 (3d Cir. 2002); *see also Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1116 (8th Cir. 2018) ("Instead, it is well-established that a employer may elaborate on its explanation for an employment decision. Evidence of a *substantial* shift in an employer's explanation for a decision may be evidence of pretext, but an elaboration generally is not." (internal citations omitted)). Providing additional reasons in this litigation does not reasonably suggest retaliatory motive.

Finally, Dr. Laurora supposes that because the Steering Committee was put together in late 2015, "[a] jury could easily conclude that [Dr.] O'Mullane recognized that the pending restructuring would provide him with the cover that he needed to divest himself of a problem employee, so long as he was willing to be patient." (Opp. Br. at 24). But on what evidence could a jury reach that conclusion? Even if the Steering Committee was put together in late 2015 and decided to eliminate her job at that time, that putative decision was about seven months after she complained to Dr. O'Mullane, and there is no evidence that Dr. O'Mullane harbored any bias against her because of the fact of her complaint, as discussed above. *See Clark Cty. Sch. Dist.*, 532 U.S. at 273; *LeBoon*, 503 F.3d at 233; *Jones*, 796 F.3d at 331. Moreover, the Steering

Committee eliminated *all* Category Leader roles, not only Dr. Laurora's position.  (SUMF ¶¶ 125 & 132).  That suggests her position was eliminated for reasons wholly separate from any personal bias that Dr. O'Mullane purportedly harbored against her.

In sum, the record is decisively one-sided against a finding that Dr. O'Mullane and Bayer engaged in ongoing antagonistic abuse towards Dr. Laurora.  The record is devoid of a necessary causal connection between Dr. Laurora's protected activity and the adverse employment actions she suffered.  Because that is sufficient to enter judgment in favor of Defendants, the Court will not address the next two steps the *McDonnell Douglas* burden-shifting framework.

## IV.   CONCLUSION

For the above reasons, the Court **GRANTS** Defendants' motion and enters judgment in their favor on all claims in Dr. Laurora's SAC.  An appropriate Order will follow.

*/s/Esther Salas*_____

Esther Salas, U.S.D.J.

Date: August 23, 2021